**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **DIA GONSALVES,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**PAUL ATKINS, CHAIRPERSON, SECURITIES AND EXCHANGE COMMISSION,**<br>100 F St., NE<br>WASHINGTON, DC 20549<br><br>**Defendant.** | ) | Civil Action No.: 1:26-cv-01711<br><br>**Jury Trial Demanded** |

**COMPLAINT**

Dia Gonsalves ("Plaintiff"), by and through her undersigned counsel, hereby complains of Defendant, the Securities and Exchange Commission ("Defendant" or "SEC"), as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff brings this action against Defendant for violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII") and the Rehabilitation Act, as amended, 29 U.S.C. § 701 *et seq*.

2. Plaintiff is an African American female. She was an employee of the SEC from July 9, 2016 through April 29, 2026.

3. Before she joined the SEC as a supervisory employee, she had been a federal employee for 28 years; she had successfully served as a manager for approximately 10 of those years. She had never been issued a disciplinary action, and she always received Outstanding performance ratings and awards for her performance.

4. Defendant, particularly its Office of Human Resources (OHR), has a documented history of discriminating against its employees who are minorities, particularly African Americans, as reported in a CNBC article entitled, “SEC Probing Alleged Racial Discrimination” that was published on February 25, 2011.

5. Plaintiff experienced this discrimination first-hand when she began working in OHR in July 2016. This discriminatory treatment included Plaintiff’s managers subjecting her to an unwarranted administrative investigation regarding unsubstantiated harassment allegations in May 2023, fabricating performance deficiencies, issuing Plaintiff an unsupported unacceptable performance rating for the 2023 performance period, and using that rating as the basis to reassign Plaintiff from her supervisory position in January 2024. Plaintiff timely filed a lawsuit regarding those issues on August 13, 2024 (Civil No. 1:24-cv-01162). That lawsuit is currently pending before this court.

**PARTIES**

6. Plaintiff is a resident of Upper Marlboro, Maryland.

7. Paul Atkins, Chairperson for the Securities and Exchange Commission, is named in his official capacity as the Defendant that employed Plaintiff.

**JURISDICTION AND VENUE**

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331 and pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*.

9. Venue is proper in this judicial district because Defendant is located here and the unlawful employment practices giving rise to this action were committed and occurred in this District.

## ADMINISTRATIVE EXHAUSTION

10. Plaintiff has exhausted her administrative remedies by timely filing this lawsuit within 90 days of the date she received the Agency's Final Agency Decision, dated February 19, 2026.

## STATEMENT OF FACTS

### *Background*

11. Plaintiff is an African American female.

12. On or about July 9, 2016, Defendant hired Plaintiff as a Branch Chief (Supervisory Management and Program Analyst, SK-15) in its OHR. She remained a Branch Chief in OHR (in two different branches at different times due to a reorganization in 2020) until January 2024 when her second line supervisor, the Director, OHR, Mark Reinhold (Caucasian male), reassigned her from the supervisory position to work on unidentified "special projects". Part of her assignment was to take direction from her former direct reports on the SEC Performance Management Program.

13. Plaintiff began reporting to Shalisha Bazemore (African American female) in this new role.

14. Plaintiff engaged in protected activity in June 2019, when she contacted an EEO counselor regarding the discriminatory harassment she suffered under her previous supervisor, Travis Elliott (Caucasian male). She remained actively involved in litigating that matter until it resolved in or around May 2022.

15. Mr. Elliott served as Mr. Reinhold's legal advisor and shared information with Mr. Reinhold regarding pending litigation/complaints within the Agency, including

Plaintiff's in or around 2020 when Mr. Reinhold joined the SEC. Mr. Reinhold was aware of this protected activity because Plaintiff informed him about it in early 2022.

16. Ms. Bazemore was aware of this protected activity because Plaintiff informed her about it in November 2023.

17. Plaintiff engaged in protected activity beginning in June 2023, when she contacted an EEO counselor regarding the discriminatory harassment she suffered from various people in OHR leadership including Mr. Elliott, Mr. Reinhold, and Ms. Bazemore. On August 13, 2024, Plaintiff filed a lawsuit regarding this complaint that is currently pending before this court (Civil No. 1:24-cv-01162).

18. Mr. Reinhold and Ms. Bazemore were aware of this protected activity because they were named as Responsible Management Officials in the complaint. Therefore, the Agency notified them when Plaintiff made allegations against them. Further, Plaintiff informed each of them when she filed complaints regarding their discriminatory and retaliatory treatment of her.

19. Plaintiff engaged in protected activity on September 20, 2024, when she contacted an EEO counselor regarding the discriminatory harassment she continued to suffer from various people in OHR leadership including Mr. Reinhold and Ms. Bazemore. Those allegations are the subject of the instant lawsuit.

20. Mr. Reinhold and Ms. Bazemore were aware of this protected activity because they were named as Responsible Management Officials in the complaint. Therefore, the Agency notified them when Plaintiff made allegations against them. Further, Plaintiff informed each of them when she filed complaints regarding their discriminatory and retaliatory treatment of her.

*The Discriminatory and Retaliatory Harassment of Plaintiff Continued after Mr. Reinhold Removed Her from the Branch Chief Position*

21. After Mr. Reinhold removed Plaintiff from the Branch Chief position and assigned her to report to Ms. Bazemore in the Immediate Office of the Director, Defendant significantly increased its harassment of Plaintiff in retaliation for Plaintiff daring to file EEO complaints against OHR leadership.

22. After less than one month of supervising Plaintiff, beginning in February 2024 and continuing, Ms. Bazemore began falsely claiming that Plaintiff had performance deficiencies. Ms. Bazemore did not treat her other subordinate employees in this manner, despite the fact that Ms. Bazemore, Mr. Reinhold, and attorneys in Defendant's Office of General Counsel (OGC) were aware that at least one of Ms. Bazemore's subordinate employees, LaShawn Pointer-Walker, had documented performance deficiencies. However, Ms. Pointer-Walker was exempt from OHR leadership's ire because she had not filed any discrimination complaints against them.

23. Ms. Bazemore immediately began isolating Plaintiff by limiting her participation in meetings to weekly one-on-one meetings with Ms. Bazemore only, not providing Plaintiff with any organizational updates, not inviting Plaintiff to meetings with other HR staff or those in the immediate office of the Director, and telling Plaintiff that she should not contact OHR leadership. Although Ms. Bazemore gave Plaintiff assignments that required Plaintiff to obtain information from other people, Ms. Bazemore directed Plaintiff not to contact Senior Officers without including Ms. Bazemore on the communication or first seeking her approval. Ms. Bazemore did not require anyone else in OHR to follow this restrictive communications rule.

24. Upon information and belief, Plaintiff was the only OHR employee who filed EEO complaints against members of senior OHR leadership, such as Mr. Elliott, Mr. Reinhold, and Ms. Bazemore.

25. Further, Plaintiff's Caucasian female counterpart, Heather Accord, was allowed to attend and participate in OHR manager meetings and interact with OHR leadership and staff freely, often directing them to provide her with final products for Mr. Reinhold and Ms. Bazemore. Ms. Accord also was a nonsupervisory employee who worked in the Immediate Office of the Director reporting to Ms. Bazemore and Mr. Reinhold.

26. Ms. Bazemore's treatment of Plaintiff, coupled with Mr. Reinhold's failure to stop it, resulted in the decline of Plaintiff's mental and physical health for which Plaintiff had to take a leave of absence under the Family and Medical Leave Act from on or around February 6 – May 9, 2024.

27. Upon Plaintiff's return to the office, Ms. Bazemore directed Plaintiff to inform her of the specific number of emails Plaintiff had to review and respond to after being out of the office for approximately three months.

28. Ms. Bazemore issued Plaintiff's 2024 performance standards on or around June 21, 2024, which included working on the Customer Experience Project (CXI). The CXI project required Plaintiff to create an OHR-wide framework for improving customer service to OHR customers and stakeholders.

29. Ms. Bazemore repeatedly changed her expectations during the course of the project. On May 29, 2024, Ms. Bazemore informed Plaintiff that she was going to task her with developing a framework leveraging and modifying existing tools to provide

better efficiencies in Human Capital programs based on data metrics, and existing tools to improve internal and external customer service. On July 9, 2024, Ms. Bazemore informed Plaintiff that the assignment required Plaintiff to create a framework that would create a structured approach to understanding and improving the interactions with OHR's internal and external customers. The language Ms. Bazemore used was so confusing that even the Assistant Directors (who ultimately would have to agree to adopt the framework for their staff to use) said they had no idea what Ms. Bazemore was trying to create. By July 22, 2024, Ms. Bazemore informed Plaintiff that she wanted her to create a framework that would outline processes, tools, strategies, and resources necessary to understand, improve, and maintain positive customer experiences.

30. While Ms. Bazemore claimed this was an important project for Plaintiff and the Agency, Ms. Bazemore repeatedly reiterated to the Agency personnel from whom Plaintiff needed to obtain information, that their participation was strictly voluntary and that even with participation in workgroup discussions they would not be required to do any work on this project aside from attending meetings.

31. Ms. Bazemore initially gave Plaintiff a deadline of September 30, 2024 to complete this agency-wide project. Given the expansive scope of the project, the initial deadline was neither feasible nor realistic.

32. Further, Ms. Bazemore did not provide Plaintiff with any staff to complete this project and restricted Plaintiff's ability to earn and use credit hours to meet the deadline.

33. In July 2024, Plaintiff contacted the COO Center of Excellence to assess options for

obtaining contractor support for the project. On or around July 31, 2024, Mary Ward (Defendant's Contracting Officer's Representative) and the IBM contractor told Plaintiff that the deadline of September 30, 2024 was not possible for the project.

34. Ms. Ward told Plaintiff verbally by phone that the project would take at least six months or more and then provided a document indicating that it would take at least seven months. Ms. Ward also told Plaintiff that a project of that magnitude would require three people to complete it – Plaintiff and two additional contractors.

35. Plaintiff shared that information with Ms. Bazemore who insisted that Plaintiff complete the project by September 30, 2024, and denied Plaintiff contractor support or any resources.

36. Ms. Bazemore ultimately extended the deadline to complete the CXI project to January 24, 2025 due to Ms. Bazemore providing untimely feedback to Plaintiff on various aspects of the assignment, OHR's general failure to provide Plaintiff with timely information due to Ms. Bazemore reiterating the voluntary nature of their participation, and the scope of the project.

37. Ms. Bazemore did not assign Ms. Accord these types of assignments or issue her the same work restrictions as Plaintiff.

38. Further, from in or around 2023 – 2025, OHR employee, Joan Worthington (Caucasian female) was tasked with completing a similar project (AskHR Customer Feedback Initiative). However, Ms. Worthington was given staff to assist (Ky Gibbs and a contractor) and more than one year to complete it. Ms. Bazemore and Mr. Reinhold were decision-makers on the project; they received briefings from Ms. Worthington during the course of the project.

39. Further, Ms. Bazemore allowed Ms. Pointer-Walker to use three contractors to support her as team lead to handle reasonable accommodation requests.

40. Despite Ms. Bazemore's unsubstantiated claims that Plaintiff required oversight to perform her job, beginning in July 2024 – almost immediately after Ms. Bazemore assigned Plaintiff the CXI project – Ms. Bazemore stopped responding to the vast majority of Plaintiff's emails. Ms. Bazemore claimed that she received too many emails to read them all or to respond to Plaintiff in a timely manner.

41. In July 2024, Ms. Bazemore also began restricting Plaintiff's ability to earn and use credit hours to complete the CXI project, despite Defendant's liberal policy of allowing its employees to earn and use the maximum number of credit hours permitted by its policy.

42. Defendant allows its employees to earn and maintain a maximum of 40 credit hours rather than the standard 24 hours that most other federal agencies allow. However, Ms. Bazemore made up numerous reasons to deny Plaintiff's requests to earn credit hours. For example, Ms. Bazemore informed Plaintiff that she would deny any request that she did not receive by noon for the day requested although the Agency did not hold anyone else to that standard. Other times, Ms. Bazemore simply stated that she was denying Plaintiff's requests because Plaintiff should be able to meet her unreasonable deadlines in an 8-hour workday. Other times, Ms. Bazemore simply denied the requests without explanation. Other times, Ms. Bazemore simply ignored the requests. Other times, Ms. Bazemore claimed she denied the requests because she did not know what Plaintiff was working on, despite the fact that she knew she had assigned Plaintiff the expansive CXI project.

43. On very few occasions, Ms. Bazemore told Plaintiff that she would only approve credit hours if Plaintiff submitted her work product to Ms. Bazemore – even if it was research, incomplete, or in draft form as proof that she had worked. Ms. Bazemore did not hold any other employee in OHR outside of Plaintiff's protected classes to that standard.

44. On or around August 9, 2024, and again on November 1, 2024, Ms. Bazemore terminated Plaintiff's telework agreement and revoked her ability to telework. Ms. Bazemore claimed she did so because of the unacceptable performance rating that Defendant issued to Plaintiff in 2023, although Ms. Bazemore was aware there was no documentation to substantiate the rating.

45. It is unclear why Ms. Bazemore found it necessary to revoke the same telework agreement twice. Plaintiff can only surmise that Ms. Bazemore did so in an effort to continue to harass Plaintiff – even when it required taking an action that had already been taken.

46. In August and September 2024, Plaintiff requested Extended Situational Telework (EST) because Ms. Bazemore's almost daily harassment of her continued to negatively impact her physical and mental health.

47. EST is a telework program Defendant offered its employees which allowed them to telework anywhere in the country for up to six months without having to continually request telework once the initial request was approved. EST could be used for medical or non-medical reasons.

48. Employees were not required to include their home address in the EST request unless they were requesting to work outside of their duty station (*i.e.*, local commuting area).

49. However, contrary to Defendant's policy, when Plaintiff submitted her EST request Ms. Bazemore required Plaintiff to amend it to include the geographic limitation of Plaintiff's home address.

50. Despite Ms. Bazemore verbally telling Plaintiff that she was going to approve the EST request, Ms. Bazemore denied it on or around September 26, 2024, and informed Plaintiff that she was ineligible to telework – despite the fact that Plaintiff had never abused the telework privilege.

51. On September 30, 2024, Ms. Bazemore directed Plaintiff not to contact Senior Officers without including Ms. Bazemore in the communication or receiving her prior approval. No other employee outside of Plaintiff's protected classes was subjected to this limitation.

52. Ms. Bazemore did not let up on her efforts to harass Plaintiff. Rather, Ms. Bazemore *created* opportunities to harass Plaintiff.

53. On October 25, 2024, Ms. Bazemore falsely accused Plaintiff of misconduct (*i.e.*, stating that Plaintiff asserted that Defendant only hired Ms. Bazemore because of her race) and threatened to discipline Plaintiff if she made similar statements.

54. Beginning in November 2024, Ms. Bazemore began denying Plaintiff's requests to use annual leave in lieu of sick leave, despite the fact that Defendant liberally allowed its employees to do this. Ms. Bazemore informed Plaintiff that she would approve Leave Without Pay (LOWP) instead. Ms. Bazemore also began requiring Plaintiff to provide medical documentation to support her requests for sick leave.

55. In late November 2024, Ms. Bazemore informed Plaintiff that she was not going to approve any of Plaintiff's annual leave requests. Ms. Bazemore did not apply this

standard to any other employee outside of Plaintiff's protected classes.

56. In November 2024, Plaintiff requested telework as a reasonable accommodation due to the negative impact Ms. Bazemore's actions were having on her physical and mental health, including dangerously elevated blood pressure, anxiety and depression for which Plaintiff needed medication to manage, and heart palpitations. Defendant subsequently denied Plaintiff's request for an interim and permanent accommodation, despite the fact that Plaintiff provided medical documentation to substantiate the request.

57. Ms. Bazemore was aware of and involved in Plaintiff's reasonable accommodation request, as Ms. Bazemore served as Defendant's Disability Program Officer (DPO) who was responsible for oversight of the reasonable accommodation program. All reasonable accommodation requests were routed to Ms. Bazemore as the DPO.

58. In November 2024, Ms. Bazemore became increasingly aggressive with Plaintiff. Ms. Bazemore's aggression interfered with Plaintiff's meetings with customers, as she would repeatedly walk by Plaintiff's office and glare at Plaintiff during Plaintiff's meetings with customers. On one occasion, Ms. Bazemore – who is a tall, large woman – stood in Plaintiff's doorway and glared at her in a menacing manner for an extended period of time.

59. On other occasions, Ms. Bazemore would yell at Plaintiff during their one-on-one meetings and hang up the telephone on her.

60. On November 18, 2024, Ms. Bazemore issued Plaintiff a Notice of Proposed Three-Day Suspension for teleworking from places other than her home. Plaintiff responded on November 29, 2024, explaining that, as the former manager of Defendant's

telework program, Plaintiff was aware that Defendant had an unwritten policy of extending flexibilities to virtually all employees in the telework program. Those liberties included not requiring employees to request or receive written supervisory approval to telework in a location other than their home; and working from their cars while traveling, other states, and even amusement parks (while in the park).

61. Plaintiff's response also explained that in or around February 23, 2023, while Plaintiff was still a manager responsible for overseeing the telework of her non-bargaining unit employees, Mr. Reinhold informed her that the 200 mile limit was being sunsetted and that an employee could telework from anywhere as long as they came into the office two times per pay period.

62. However, Mr. Reinhold subsequently upheld the proposed suspension and required Plaintiff to serve an unpaid three-day suspension from January 14 – 16, 2025. When Plaintiff informed Mr. Reinhold that Ms. Bazemore had issued her a deadline of January 17, 2025, to complete an assignment related to the CXI project, Mr. Reinhold directed Plaintiff to ask Ms. Bazemore if she would change the suspension dates or the project deadline. Ms. Bazemore did not.

63. Beginning in November 2024 and continuing, Plaintiff reported Ms. Bazemore's harassing actions to Mr. Reinhold and Defendant's former Chief Operating Officer, Kenneth Johnson. However, neither took any action to investigate Plaintiff's allegations or to stop Ms. Bazemore's unbridled harassment.

64. As a result, on or around November 29, 2024, Plaintiff suffered severe chest pains and heart palpitations that resulted in her being taken away from the workplace by ambulance.

65. The Office of Personnel Management (OPM) declared the federal government closed on Monday, January 6, 2025 due to a snowstorm that prevented everyone from traveling on the roads. On Sunday, January 5, 2025, Plaintiff requested to telework on Monday, January 6, 2025, for that reason. Ms. Bazemore responded later the following morning and informed Plaintiff that she would make a "one-time exception" to allow Plaintiff to telework that day only. Plaintiff teleworked that day.

66. OPM also declared the federal government closed on Tuesday, January 7, 2025, because of the snowstorm and granted administrative leave to people who were not telework eligible.

67. Plaintiff did not telework on January 7, 2025, because Ms. Bazemore have previously informed her that she was ineligible to telework and that she had only made a one-time exception to allow Plaintiff to telework the previous day.

68. However, on January 10, 2025, Ms. Bazemore informed Plaintiff that she had to use annual leave instead of administrative leave for January 7, 2025, despite OPM's declaration. When Plaintiff reported this to Mr. Reinhold and Defendant's Office of the Inspector General, both deferred to Ms. Bazemore's unlawful directive and required Plaintiff to use annual leave. Ms. Bazemore did not require anyone outside of Plaintiff's protected classes to use annual leave when OPM declared the federal government closed.

69. On January 10, 2025, Ms. Bazemore also repeatedly questioned whether Plaintiff worked on January 6, 2025, despite the fact that Ms. Bazemore had been in communication with Plaintiff on January 6, 2025 and Plaintiff informed Ms. Bazemore of the hours she planned to work.

70. In early January 2025, Ms. Bazemore also attempted to obfuscate when Plaintiff submitted her CXI deliverables and what Plaintiff submitted by prohibiting Plaintiff from emailing her work to Ms. Bazemore and requiring Plaintiff to submit her work on a SharePoint site. Emails would allow Plaintiff to prove what she submitted to Ms. Bazemore and when she submitted it, whereas SharePoint only tracked the last update.

71. Further, Ms. Bazemore directed Plaintiff to submit her work on a daily basis for Ms. Bazemore to review – even if it was incomplete, in draft form, or not yet due.

72. Given Ms. Bazemore's propensity for fabricating performance issues, Plaintiff informed Ms. Bazemore that she preferred to submit her assignments via email when they were complete.

73. On January 30, 2025, Ms. Bazemore issued Plaintiff a Notice of Proposed Seven-Day Suspension for failure to upload her working papers (*i.e.*, incomplete work) to SharePoint by 9:00 a.m. on January 17 and 23, 2025. Plaintiff responded and explained that she had just completed serving the three-day suspension from January 14 – 16, 2025, and had a major deadline to meet on January 17, 2025, which prevented her from uploading working papers by 9:00 a.m. on January 17, 2025. Plaintiff also explained that she had subsequently been on sick leave until January 23, 2025. However, on February 20, 2025, Mr. Reinhold upheld the proposed suspension and required Plaintiff to serve an unpaid seven-day suspension.

74. Notably, Ms. Bazemore never bothered to open the documents when they were posted to SharePoint. She only clicked on the documents once on February 9, 2025, after Plaintiff inquired about not receiving feedback. As of March 2026 – one year later –

Ms. Bazemore had not accessed them again. Further, of the approximately 20 documents Plaintiff uploaded to SharePoint, Ms. Bazemore only provided feedback on one.

75. On February 10, 2025, Ms. Bazemore falsely accused Plaintiff of having discrepancies in her timecard. However, Ms. Bazemore was unable to identify what they were.

76. On February 28, 2025, Ms. Bazemore relocated Plaintiff's workspace away from the Immediate Office of the Director, OHR though Plaintiff was a member of the Immediate Office of the Director. Instead, Heather Accord was moved into Plaintiff's office and was seated in the area of the building referred to as "manager row" where OHR managers were seated. Plaintiff was relocated out of sight in space near the Office of Information Technology and Office of the Acquisitions. Plaintiff had no privacy afforded to senior employees and was placed in a shared space and given a junior cubicle in a space in front of a glass window for all to see after having been a manager and served in government for more than 30 years.

77. When Plaintiff asked to meet with Ms. Bazemore to discuss the move, Ms. Bazemore declined and told Plaintiff to pack her things or Ms. Bazemore would have them packed and moved for her. Ms. Bazemore did not treat other employees involved in the move in this manner. Rather, she met with them to discuss their concerns.

78. Defendant offered its employees a flex schedule, which allowed employees to make up work time they may have missed by allowing them to work earlier or later hours rather than having to use leave. On March 26, 2025, Ms. Bazemore prohibited Plaintiff from using her flexible schedule. Ms. Bazemore did not deny this privilege

of employment to anyone outside of Plaintiff's protected classes.

79. On April 11, 2025, Ms. Bazemore issued Plaintiff an unacceptable rating for the 2024 performance period despite the fact that Plaintiff had performed successfully on the CXI project during that period with no help from anyone.

80. Specifically, Plaintiff led the OHR and SEC workgroups; designed the questions with input from the workgroup; designed and conducted SEC focus groups (19) with input from the SEC wide workgroup; scheduled all meetings and typed all notes; conducted all data analysis without content coding and peer review which is common for these types of studies like; and developed, drafted, and submitted approximately 22 work products to Ms. Bazemore to which she provided no feedback on them dating back to November 14, 2024.

81. Ms. Bazemore also placed Plaintiff on a Performance Improvement Plan (PIP) on April 11, 2025. The PIP included complex assignments for which Plaintiff had no training and very short deadlines. As with the CXI project, Ms. Bazemore restricted Plaintiff's use of credit hours and access to resources to complete the assignments.

82. On April 14, 2025, Ms. Bazemore questioned Plaintiff's submission of five bullet points to OPM regarding what she had worked on the previous week, despite the fact that it was a Department of Government Efficiency (DOGE) requirement for all federal employees to do so.

83. Indeed, Defendant provided all of its employees with a limited list of categories of bullets they were allowed to submit to DOGE. However, Ms. Bazemore questioned Plaintiff about the use of those bullet points.

84. Despite communicating with Plaintiff on April 14, 2025, Ms. Bazemore ignored

Plaintiff's leave request from April 14 – 17, 2025, effectively denying them. Plaintiff missed a medical appointment she had scheduled for April 17, 2025, due to Ms. Bazemore's actions. This was a consistent pattern of behavior for Ms. Bazemore.

85. On April 17, 2025, Plaintiff attended the monthly OHR Customer Meeting that all OHR employees are encouraged to attend. The purpose of the meeting is for OHR to provide updates to their customers and to remain aware of what is going on in OHR.

86. However, Ms. Bazemore informed Plaintiff that she should use her time more efficiently, effectively telling Plaintiff not to attend the meeting. Ms. Bazemore did not restrict anyone else outside of Plaintiff's protected classes from attending the meeting.

87. On April 17 and 24, 2025, Ms. Bazemore also denied Plaintiff's request for credit hours to work on PIP-related assignments, despite the fact that Ms. Bazemore gave Plaintiff unreasonable deadlines for the complex PIP assignments.

88. On April 18, 2025, Ms. Bazemore directed Plaintiff to use hoteling space that was in a common area, rather than use the private conference room Plaintiff had already identified, to participate in their virtual one-on-one meetings. There were numerous employees in the area who could hear what was being said because the space was not private. Further, the hoteling space was in another building while the space the Plaintiff had identified was seconds from Plaintiff's office. Ms. Bazemore did not subject any other employees outside of Plaintiff's protected classes to similar treatment.

89. On April 25, 2025, Ms. Bazemore prohibited Plaintiff from contacting staff to collect information needed to complete her PIP-related assignments. She also directed

Plaintiff to submit her assignments to the SharePoint site rather than emailing them. Once again, Ms. Bazemore failed to check the SharePoint site despite making it a requirement for Plaintiff to post her work there.

90. On June 10, 2025, Ms. Bazemore and Mr. Reinhold instructed OHR staff to upload Plaintiff's 2024 performance appraisal into Plaintiff's Official Personnel Folder without including Plaintiff's self-assessment which refuted the false statements Ms. Bazemore included in the rating.

*Ms. Bazemore Has a Documented History of Dishonesty and Committing Prohibited Personnel Practices*

91. With Mr. Reinhold's blessing, Ms. Bazemore abused her authority as Plaintiff's manager to unjustifiably deny Plaintiff every term, condition, and privilege of employment. Ms. Bazemore did not treat any other OHR employee outside of Plaintiff's protected classes that way.

92. Significantly, Ms. Bazemore has a documented history of abusing her managerial authority, being dishonest, and violating the law regarding exercising merit principles in the federal government.

93. In or around 2025, the Office of Special Counsel (OSC) found that Ms. Bazemore had engaged in prohibited personnel practices when she worked as a senior HR official at her previous employer, the Food and Drug Administration (FDA). The OSC found that Ms. Bazemore had "afforded illegal preferences and advantages to multiple applicants" and "pressure[ed] subordinates within HR to improperly select unqualified candidates for multiple positions."

94. Ms. Bazemore's unlawful actions were so egregious that OSC required Defendant to

suspend her for 36 days. However, Ms. Bazemore bragged, and Mr. Reinhold admitted during his deposition in Civil Case No. 1:24-cv-01162, that Defendant only required Ms. Bazemore to serve five unpaid days of suspension.

95. Indeed, Mr. Reinhold – Defendant's Director, OHR – testified that he was "disinterested" that Ms. Bazemore, the Deputy Director, OHR, had been found to have engaged in illegal hiring practices and bullied her subordinate staff into doing so as well.

96. What is more egregious than Ms. Bazemore repeatedly committing, and bullying her staff into committing, prohibited personnel practices in her previous position, is that Mr. Reinhold allowed her to retain her position as the Deputy Director, OHR after finding out about it, and continued to support Ms. Bazemore's attempts to take actions against Plaintiff when he knew that Ms. Bazemore had a propensity for being dishonest and taking unlawful employment actions.

97. In contrast, Plaintiff had a documented history of excellent performance and conduct before Mr. Reinhold and Ms. Bazemore began this campaign of discriminatory harassment and retaliation against her.

**COUNT 1**

98. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

99. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and denying Plaintiff's leave requests and restricting her ability to earn and use credit hours.

100. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights

Act of 1964.

101. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, among other harm.

**COUNT 2**

102. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

103. Defendant subjected Plaintiff to unlawful retaliation by denying Plaintiff's leave requests and restricting her ability to earn and use credit hours.

104. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

105. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, among other harm.

**COUNT 3**

106. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

107. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and issuing her an unacceptable rating for the 2024 performance period.

108. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964.

109. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 4**

110. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

111. Defendant subjected Plaintiff to unlawful retaliation by issuing her an unacceptable rating for the 2024 performance period.

112. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

113. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 5**

114. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

115. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and placing her on a Performance Improvement Plan.

116. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964.

117. Defendant acted with malice or reckless indifference to Plaintiff's rights.

118. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 6**

119. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

120. Defendant subjected Plaintiff to unlawful retaliation by placing her on a Performance Improvement Plan.

121. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

122. Defendant acted with malice or reckless indifference to Plaintiff's rights.

123. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

## COUNT 7

124. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

125. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and revoking her ability to telework via Defendant's telework program and Extended Situational Telework program.

126. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964.

127. Defendant acted with malice or reckless indifference to Plaintiff's rights.

128. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other

harm.

**COUNT 8**

129. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

130. Defendant subjected Plaintiff to unlawful retaliation by revoking her ability to telework via Defendant's telework program and Extended Situational Telework program.

131. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

132. Defendant acted with malice or reckless indifference to Plaintiff's rights.

133. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 9**

134. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

135. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and issuing her a three-day suspension.

136. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964.

137. Defendant acted with malice or reckless indifference to Plaintiff's rights.

138. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 10**

139. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

140. Defendant subjected Plaintiff to unlawful retaliation by issuing her a three-day suspension.

141. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

142. Defendant acted with malice or reckless indifference to Plaintiff's rights.

143. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 11**

144. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

145. Defendant subjected Plaintiff to unlawful discrimination on the bases of her race and sex by subjecting her to disparate treatment and issuing her a seven-day suspension.

146. By and through its conduct, Defendant subjected Plaintiff to unlawful discrimination based on her race and sex in violation of Title VII of the Civil Rights Act of 1964.

147. Defendant acted with malice or reckless indifference to Plaintiff's rights.

148. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 12**

149. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

150. Defendant subjected Plaintiff to unlawful retaliation by issuing her a seven-day suspension.

151. By and through its conduct, Defendant subjected Plaintiff to unlawful retaliation in violation of Title VII of the Civil Rights Act of 1964.

152. Defendant acted with malice or reckless indifference to Plaintiff's rights.

153. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm.

**COUNT 13**

154. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

155. Defendant violated the Rehabilitation Act when it denied Plaintiff reasonable accommodation.

156. Defendant acted with malice or reckless indifference to Plaintiff's rights.

157. As a result, Plaintiff has sustained damages consisting of emotional distress, pain and suffering, among other harm.

**COUNT 14**

158. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

159. By and through its conduct, Defendant subjected Plaintiff to an unlawful hostile work environment based on race and sex in violation of Title VII of the Civil Rights Act of 1964.

160. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm. Plaintiff's harm is continuing.

**COUNT 15**

161. Plaintiff repeats and realleges the allegations set forth in the above paragraphs.

162. By and through its conduct, Defendant subjected Plaintiff to an unlawful hostile work environment based on retaliation in violation of Title VII of the Civil Rights Act of 1964.

163. Plaintiff has sustained damages consisting of emotional distress, pain and suffering, harm to professional reputation, loss of future promotion/managerial opportunities, and diminished earning capacity, among other harm. Plaintiff's harm is continuing.

**JURY DEMAND**

Plaintiff demands a trial by jury on all counts contained in the Complaint.

**WHEREFORE**, Plaintiff respectfully requests this Court enter judgment against the Defendant on all Counts and award Plaintiff rescission of the unacceptable performance rating and issuance of an acceptable rating; rescission of the suspensions and correction of Plaintiff's

Official Personnel Folder; restoration of leave; compensatory damages in the amount of $300,000 for pain and suffering and emotional distress, or in an amount to be determined by a jury; pre- and post-judgment interest; costs; attorneys' fees; tax on any award; and any such other relief as is just and proper.

Date: May 19, 2026

Respectfully submitted,

/s/ *N. Campbell*

Nekeisha Campbell [DC Bar No. 1754385]
Alan Lescht [DC Bar No. 441691]
Alan Lescht & Associates, P.C.
1825 K Street NW, Suite 750
Washington DC, 20006
T: (202) 315-1738
F: (202) 463-6067
nekeisha.campbell@leschtlaw.com
alan.lescht@leschtlaw.com
*Counsel for Plaintiff*